Gerald L. SUMPTER, Social Security
No. 491–32–2108, Plaintiff,

v.

Otis R. BOWEN, M.D., Secretary of
Health and Human Services,
Defendant.

No. C88–205–K.

United States District Court,
D. Wyoming.

Jan. 20, 1989.

Lloyd E. Hartford, on the brief, Billings, Mont., for plaintiff.

Toshiro Suyematsu, Asst. U.S. Atty., D. Wyo., on the brief, Cheyenne, Wyo., for defendant.

## ORDER AFFIRMING DECISION OF SECRETARY OF HEALTH AND HUMAN SERVICES (WITH FINDINGS)

KERR, District Judge.

The above-entitled matter having come on regularly before the Court upon appeal from a decision of the Appeals Council of the Department of Health and Human Services denying plaintiff's request for review of the decision of the Administrative Law Judge (ALJ) finding plaintiff not entitled to disability insurance benefits or supplemental security income benefits, which appeal was submitted on the briefs without the necessity of oral argument upon stipulation of the parties, and the Court having fully and carefully reviewed and considered the record, the briefs of the parties and all matters pertinent thereto, and being fully advised in the premises, FINDS:

This is an appeal from a decision of the Secretary of Health and Human Services (Secretary) denying disability insurance (DI) benefits and supplemental security income (SSI) benefits to plaintiff Gerald Sumpter under Title II of the Social Securi-

ty Act (Act), 42 U.S.C. §§ 401–433, and Title XVI of the Act, 42 U.S.C. §§ 1381–1383c, respectively. This Court has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

Plaintiff Sumpter, now a 54-year old widower residing in Cody, Wyoming, injured his back in 1971 when, while in the employ of a railroad company as a mason, he slipped on a cement bag on which he was standing as he was unloading cement bags from a boxcar and fell, twisting his lower back. He has not worked since then, maintaining that due not only to his back problems and pain associated therewith but also because of arthritis, hearing impairments, poor eyesight, problems with balance, and depression, he has been rendered disabled. His son and daughter-in-law have moved into Sumpter's home, paying the bills and providing essentials such as cooking meals and washing laundry. Sumpter complains of having difficulty raising a cup of coffee when he gets up in the mornings for about half an hour until his hands and fingers start functioning properly. Record at 71 (Tr. at 20). Sumpter's educational background extends only to a portion of the seventh grade when he withdrew from school. Other than that he has had less than a year of mechanics training. Record at 37–38, 227.

Complaining of low back pain with radiation into his legs since his accident, Sumpter visited Dr. Schoedinger in St. Louis, Missouri. At that time, according to the medical report of June 6, 1972, Dr. Schoedinger suspected sciatic nerve involvement. Record at 162. On October 12, 1973, Sumpter underwent an operation for a herniated nucleus pulposus; a fusion was performed at L5–S1, along with a complete laminectomy at L5 and a partial laminectomy at L4. Record at 173.

Sumpter filed his latest applications for SSI and DI benefits on February 27, 1987 and March 2, 1987, respectively, alleging an onset date of February 14, 1971, the date of his accident.[1] He had been receiving DI

---

**1.** Sumpter's first application for DI benefits was filed September 25, 1973, alleging as an onset date February 14, 1971. Record at 102–105. Apart from the applications which are the sub-

benefits until it was determined by ALJ Paynter in 1983 that Sumpter's disability ceased on November 30, 1982 due to medical improvement. Record at 192–197. The ALJ concluded that Sumpter's entitlement to a period of disability and DI benefits ended January 31, 1983. *See also* Record at 141–142. On reconsideration, that decision was upheld. Record at 150. No further appeal was taken.

A hearing was held before ALJ Hiaring on September 9, 1987 regarding Sumpter's latest applications. By decision dated December 28, 1987, ALJ Hiaring found Sumpter was not disabled for any period of time since the cessation of his benefits and accordingly disallowed both SSI and DI benefits. Record at 12–25. A subsequent review request to the Appeals Council was denied, leaving the ALJ's decision as final action by the Secretary. Record at 5–6.

On appeal to this Court, plaintiff raises several points of error. Initially, the argument is made that Sumpter's benefits were wrongfully terminated after the first month in 1983. Plaintiff urges the Court to reopen ALJ Paynter's decision of five years ago, contending that medical evidence substantiates his subjective complaints of disabling pain. On this point, defendant counters that this circuit's decision in *Belveal v. Heckler*, 796 F.2d 1261, 1263 (10th Cir.1986) as well as the Supreme Court's ruling in *Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) militate against this Court taking any action which would reopen ALJ Paynter's decision.

Administrative regulations provide for the reopening of previous decisions from which an appeal was not taken within the prescribed time period. *See* 20 C.F.R. § 404.988. Upon request made within four years of the decision sought to be revised, the matter will be reopened only if good cause exists. § 404.988(b). Although the "good cause" standard is not mentioned beyond four years, § 404.988(c) enumerates specific circumstances under which a decision may be reopened at any time, the first such reason being for "fraud or similar fault...." § 404.988(c)(1). The regulations clarify "good cause" as existing if "(1) [n]ew and material evidence is furnished; (2) [a] clerical error in the computation or recomputation of benefits was made; or (3) [t]he evidence that was considered in making the determination or decision clearly shows on its face that an error was made...." § 404.989(a).

Congress clearly spoke when, under the jurisdictional statute, 42 U.S.C. § 405(g), it limited federal district court review of final decisions of the Secretary to appeals brought within sixty days of any such final decision. No appeal was taken beyond the request for reconsideration of ALJ Paynter's decision. *Sanders* specifically recognizes that § 405(g) does not authorize judicial intervention for alleged abuses of agency discretion in the decision to not reopen a claim for benefits. *Sanders*, 430 U.S. at 107–108, 97 S.Ct. at 985–86.

However, the inquiry does not end here. With his request to reopen the prior decision, plaintiff raises an issue of constitutional magnitude, one which *Sanders* found more suited to determination by the courts rather than administrative agencies. *Id.* at 109, 97 S.Ct. at 986. Plaintiff argues that medical evidence proves that his disability had not ceased in 1982 and that the decision to the contrary works not only a manifest injustice but a denial of due process.

Due process has its underpinnings in the belief that "a person in jeopardy of serious loss [must be given] notice of the case against him and opportunity to meet it." *Joint Anti–Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 171–172, 71 S.Ct. 624, 648–49, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). Termination of DI benefits does not require that a pretermination hearing be held in order to satisfy this essential constitutional guarantee. *Mathews v. Eldridge*, 424 U.S. 319, 349, 96 S.Ct. 893, 909, 47 L.Ed.2d 18 (1976). *But cf. Goldberg v. Kelly*, 397 U.S. 254, 90

---

ject of this review, Sumpter filed an application for DI benefits on October 3, 1983, record at 198–201, along with applications for both SSI and DI benefits on July 22, 1985 and August 29, 1986. Record at 243–256 and 302–315.

S.Ct. 1011, 25 L.Ed.2d 287 (1970) (due process requires that an evidentiary hearing be held prior to termination of a recipient's welfare benefits). *Goldberg* remains the only instance in the realm of statutory entitlements where a hearing prior to termination is an essential. This is appropriately so when one considers that continued entitlement to welfare benefits turns on credibility and veracity determinations while the decision to terminate DI benefits depends solely upon documentary medical evidence of a recipient's condition. *See Goldberg*, 397 U.S. at 269, 90 S.Ct. at 1021.

■ To evaluate plaintiff's due process challenge, the Court looks to the evidence considered at the administrative level. On November 4, 1982, plaintiff was notified that, as per a previous letter, his continued entitlement to benefits was in doubt. Record at 125–126. The reports of Drs. Mitchell, Robinson, and Rehder were indicated as considered in the process. Record at 125. Acknowledging the existence of some discomfort, the conclusion nonetheless was that Sumpter's ability to stand, walk, and use his arms was not seriously limited. *Id.* As for the hearing loss, the use of a hearing aid convinced the agency of Sumpter's ability to engage in everyday social communication. *Id.* Plaintiff was informed of his right to submit any contrary evidence within ten days. Sumpter submitted a personal letter as well as letters written by friends, including a housekeeper, relating to the disability evaluation. Record at 127–134. By notice dated November 26, 1982, Sumpter was informed that his disability ended in November 1982 and that benefits would be discontinued January 31, 1983. Record at 141–142. Along with that notice was included information about procedures to be followed in the event of disagreement with the termination decision. Record at 142. Based upon that information, Sumpter requested a reconsideration. Record at 143. Upon reconsideration, the prior decision was found proper and plaintiff again was specifically told how to pursue further remedies. Record at 148–150. Accordingly, Sumpter requested a hearing before an ALJ. Record at 151. That hearing culminated in ALJ Paynter's decision finding no impropriety in the agency's previous actions.

A review of the medical evidence available to the agency at the time the termination question was being considered supports the conclusion reached. Dr. Mitchell's report of July 19, 1982, which was considered, shows that Sumpter had a full range of motion of the cervical and thoracic regions with an ability to flex the lumbar spine forward approximately forty degrees. Record at 179. Noting that plaintiff sometimes falls while walking, Dr. Mitchell found that Sumpter's knee joints are fully stable with a full range of motion. *Id.* He did caution that Sumpter could not engage in any type of manual activity. *Id.*

Two other reports relied upon were those of Drs. Robinson and Rehder. Dr. Robinson observed that Sumpter "hobble[d] about like an elderly individual" rather than a man of 48 at that time. Record at 181. While Sumpter was found to be hard of hearing, Dr. Robinson reported his cranial nerves to be intact. *Id.* No atrophy or abnormal movements were found in the arms or legs. Record at 182. The neurologic examination revealed no motor or sensory defects, but Dr. Robinson opined that Sumpter's chronic low back pain make his return to manual labor unlikely. *Id.*

Dr. Rehder, an audiologist, found Sumpter to have moderate to severe hearing loss in the right ear and severe to profound loss in the left ear. Record at 183. His conclusion essentially was that Sumpter was a good candidate for a hearing aid. Record at 184. ALJ Paynter reviewed all of this evidence along with plaintiff's testimony and found that his impairments did not preclude a full range of sedentary work. Record at 192–197. This Court is hardpressed to find anything in the procedures utilized at the administrative level regarding termination of Sumpter's benefits which would place his due process rights in peril. No interest would be advanced by reopening that previous determination. As the Court in *Eldridge* concluded, "the present administrative procedures fully

comport with due process." *Eldridge,* 424 U.S. at 349, 96 S.Ct. at 909.

Turning now to the 1987 decision of ALJ Hiaring denying both SSI and DI benefits, plaintiff contends that the Secretary failed to give proper consideration to the opinions of plaintiff's treating physicians. Moreover, plaintiff's position is that his testimony of disabling pain was fully credible. For these reasons, plaintiff urges that ALJ Hiaring's decision is unsupported by substantial evidence. The Secretary maintains that substantial evidence exists for his conclusion that plaintiff was not disabled.

Final agency action will be affirmed only if the decision appealed from is supported by substantial evidence. *See Tillery v. Schweiker,* 713 F.2d 601, 603 (10th Cir. 1983). Substantial evidence is " 'more than a mere scintilla' "; it represents " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Broadbent v. Harris,* 698 F.2d 407, 414 (10th Cir.1983) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)). A reviewing court must "meticulously examine the record" to determine whether this standard has been adhered to. *Id.* However, evidence must not be viewed with an eye toward substituting a court's discretion for that of the agency. *See, e.g., Talbot v. Heckler,* 814 F.2d 1456, 1461 (10th Cir. 1987) and *Cagle v. Califano,* 638 F.2d 219, 220 (10th Cir.1981).

A "disability" is statutorily explained as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A) (1982). *See also* 42 U.S.C. § 1382c(a)(3)(A). Thus:

> [A]n individual ... shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other

kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. § 423(d)(2)(A). *See also* § 1382c(a)(3)(B).

The five step sequential evaluation process involved in the ultimate determination of whether or not a claimant is disabled was fully described by this Court in *Baker v. Bowen,* 697 F.Supp. 430, 433–434 (D.Wyo.1988). Plaintiff asserts that ALJ Hiaring ignored the opinions of his treating physicians, Dr. Mitchell and Dr. Stanley, opinions which, according to Sumpter, conclusively confirm his disability. It is well-settled that without good cause the Secretary must give substantial weight to the findings of a claimant's treating physician. *See Byron v. Heckler,* 742 F.2d 1232, 1235 (10th Cir.1984). Specific, legitimate reasons must accompany the disregard of a treating physician's opinion. *Id.* A review of the record and the ALJ's decision prove plaintiff's assertion to be meritless. ALJ Hiaring noted that for almost ten years following his successful laminectomy and fusion, Sumpter was under virtually no medical care. Record at 17. The record shows that he visited Dr. Mitchell, a family practitioner, July 19, 1982 for a disability evaluation, complaining of pain mostly from the heel to his knee in both lower extremities. Record at 177. Although Sumpter complained of occasionally losing control of the lower extremities and suddenly falling down, he stated that he "accepts this as a frequent complication ... [and] plans his walks accordingly...." Record at 178. Apart from vision problems for which he was not wearing glasses and for his hearing loss, his physical examination was unremarkable. *Id.* The same was true for his orthopedic examination as discussed previously. Record at 179.

In 1983, Dr. Mitchell referred Sumpter to a neurological specialist, Dr. Smith, who conducted a full array of tests, including physical and neurologic examinations.

Record at 233–239. The results were within normal limits. Dr. Smith conducted a complete examination of the back and lower extremities and observed that Sumpter's stance was unremarkable with no tenderness in the area of his lengthy laminectomy scar or in any other portion of the lumbar spine. Record at 237. Sumpter could get his fingertips to his knees before going into a spasm, a condition the neurologist considered typical of lumbar disc disease. *Id.* Dr. Smith observed some hamstring tightness when Sumpter was in a sitting position at about forty-five to fifty degrees. *Id.* Only at about thirty-five degrees when in a recumbent position did Sumpter complain of pain in the calves. *Id.*

Dr. Smith found no calcification of the disc, reporting instead that the fusion between L5 and the sacrum was solid and indicative of a good fusion. Record at 238. The neurologist's ultimate conclusion:

> [T]aking this man at face value and giving him the benefit of the doubt, he well may have had pain from degenerative disc disease at L–4 for many years with back spasm which may have precluded his carrying out heavy work or [at] least even trying. I think he has been discouraged by all of the people that have examined him. I think there is certainly no reason objectively why he should not be able to work and if he insists that he cannot and insists that he has pain and we see evidence of spasm of his back on movements then I think further evaluation of the L–4 disc space is warranted ... [I]n any event, I see no reason that this man should not be able to return to the work force if ... [further surgery at L4 was performed]. Certainly the description he has of his hand function in the morning is purely psychological and can be overcome ... I would have to let the Social Security Disability people understand that there is certainly no evidence for permanent and total disability. I think that he may have disability based on back pain related to his lumbar disc but this should be able to be correctable and I would think he could be gotten back into gainful employment. I would not anticipate that he ever would be able to carry out heavy labor, repeated bending and stooping or heavy lifting. Nonetheless I should think some form of occupation could be provided for him that would not require any of these stipulations even though he does only have a seventh grade education.

Record at 238.

Dr. Smith's recommendation that plaintiff undergo further surgery for greater comfort apparently went unheeded, plaintiff evidently believing that the surgeon's examination had not been thorough. Record at 351. During the course of his visit with Dr. Smith, Sumpter had given indications of willingness to work despite the pain. Record at 241. At that time, the strong feeling was that psychological counseling would aid Sumpter in dispelling his engrained belief of the nature of his condition as well as help him deal with being out of work. Record at 242.

While a treating physician's report is entitled to greater weight than that of an examining physician, *Turner v. Heckler*, 754 F.2d 326, 329 (10th Cir.1985), the latter's report should be evaluated to determine if it " 'outweighs' the treating physician's report, not the other way around." *Reyes v. Bowen*, 845 F.2d 242, 245 (10th Cir.1988). Dr. Smith's report was not generated through a review of Sumpter's medical records without the benefit of a personal examination of the claimant and thus carries greater weight than a report that would have been so generated. Thus, a review of Dr. Smith's report should be viewed in this light.

Interestingly enough, Dr. Stanley, whom plaintiff characterizes as a treating physician, only became aware for the first time on September 25, 1986 of plaintiff's claimed disability due mainly to his manner of appearance—this despite Sumpter having been seen by Dr. Stanley on previous occasions in conjunction with other family members—and rendered his opinion that same day. Record at 350. Based upon that single visit, Dr. Stanley indicated that Sumpter's lumbar flexion appeared very poor while dorsiflexion and plantar flexion seemed weakened. *Id.* Although he felt

that plaintiff could not perform any manual work "at the present time," Dr. Stanley offered the observation that rehabilitation therapy, together with surgery and counseling could lead to Sumpter's return to a productive lifestyle. Record at 351. In this respect, Dr. Stanley's diagnosis mirrors that of Dr. Smith.

Dr. Robinson, a neurologist, examined plaintiff on November 4, 1986 and saw no evidence of nerve entrapment in the X-rays and, in fact, found evidence of minimal osteoarthritis of the back. Record at 353. His examination revealed no major abnormalities save plaintiff's acute hearing problem. Dr. Robinson's final conclusion: "I think this man is able to work. I find hysterical findings on exam only and the x-rays are not that impressive to confirm his complaints of pain." *Id.*

In reviewing the ALJ's decision, the Court finds that proper consideration was given to the views of all physicians who had input. Given Dr. Stanley's reaction as treating physician to learning of plaintiff's complaints for the first time in September 1986, the same date of his report, when plaintiff had not exhibited the problems complained of to Dr. Stanley on prior visits over the years, the Court cannot say that improper weight was given to Dr. Stanley's report. After all, Dr. Stanley at that point in time was not in a discernably different position than Dr. Smith. *Cf. Poulin v. Bowen*, 817 F.2d 865, 873 (D.C.Cir.1987) (report of treating physician *who is familiar with claimant's condition* is to be accorded substantial weight). There is no indication that ALJ Hiaring totally disregarded the views of Drs. Mitchell and Stanley. On the contrary, he noted that they cautioned against any type of manual work but found evidence not only from them but other physicians as well showing that further surgery, rehabilitative therapy, and flexion exercises would lead to improvement in plaintiff's condition. *See* Record at 297 and 301 (reports of Drs. Farris and Wecker). Despite the overwhelming impression that plaintiff possessed the ability to better his own condition so as to facilitate his return to the workplace, Sumpter refused to try. Plain-

tiff places much reliance on the opinions showing him unable to perform any manual work. The weakness with such a stance is that the inability to perform manual labor does not automatically translate into a disability under the Act. *See Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir.1988).

■ Plaintiff also argues that the ALJ improperly discounted his subjective complaints of disabling pain. This circuit has recently refined the methodology to be utilized in pain cases. *See, e.g., Williams v. Bowen*, 844 F.2d 748 (10th Cir.1988); *Gatson v. Bowen*, 838 F.2d 442 (10th Cir.1988); *Huston v. Bowen*, 838 F.2d 1125 (10th Cir. 1988); and *Luna v. Bowen*, 834 F.2d 161 (10th Cir.1987). Notwithstanding, the standard still remains as enunciated in *Nieto v. Heckler*, 750 F.2d 59 (10th Cir.1984):

Subjective pain must be evaluated with due consideration for credibility, motivation, and medical evidence ... Yet a medical finding of disability is not based solely on objective test results. It includes an evaluation of the patient's medical history and the physician's observations of the patient, and necessarily involves an evaluation of the credibility of the patient's subjective complaints of pain. A medical opinion based on all of these factors is medical evidence supporting a claim of disabling pain, even if the objective test results, taken alone, do not fully substantiate the claim.

*Nieto*, 750 F.2d at 61–62 (citation omitted). All that is required is a "loose nexus" between the impairment and the pain such that it may be said that the impairment may reasonably be expected to produce the pain complained of. *Luna*, 834 F.2d at 164.

Sumpter testified that he experiences pain constantly in his legs and back and that the pain interferes with his sleep such that he "[hasn't] had a ... complete night's sleep in 8 years." Record at 84. The ALJ acknowledged plaintiff's subjective complaints of pain but based upon the evidence before him concluded them to be not credible. Record at 15, 19, 20. Problems with sitting, standing, and sleeping due to pain

were recently insufficient to convince the Tenth Circuit to reverse a district court's denial of a claimant's application for SSI benefits. *See Ray v. Bowen,* No. 86–2341, 865 F.2d 222 (10th Cir.1989) (WESTLAW, 1989 WL 427).

Sumpter's testimony is indicative of activities inconsistent with the level of pain complained of. For example, he goes out with a friend on a daily basis to have coffee. Record at 66. He traveled to Illinois for about a week in April or May of 1987, although someone else drove. *Id.* He goes to the grocery store once a week. Record at 67. He drove from Cody, Wyoming to Billings, Montana, over one hundred miles, to appear at the hearing before ALJ Hiaring with only two stops along the way. *Id.* Medical documentation fails to corroborate the level of pain alleged, prompting physicians to remark that the amount of pain complained of is simply inconsistent with his impairments. As for the pain which Sumpter undoubtedly experiences, he controls it with medication. Record at 84–85. Sumpter contends the pain makes it impossible to work; however, "disability requires more than mere inability to work without pain." *Brown v. Bowen,* 801 F.2d 361, 362 (10th Cir.1986).

Plaintiff's reliance upon *Frey v. Bowen,* 816 F.2d 508 (10th Cir.1987) as supportive of his position on the issue of pain is misplaced. Although *Frey* involved a claimant who experienced chronic pain in his back and neck as well as to other parts of his body, the circumstances which led the Tenth Circuit to conclude that Frey was disabled are distinguishable from those which attend Sumpter. Influential to the court in *Frey* was the compromising predicament posed by pain medication available to Frey. While pain medications would have undisputably enhanced Frey's ability to perform sedentary work, Frey could not avail himself of the medications due to side effects of stomach irritation. *Frey,* 816 F.2d at 517. There, the court remarked that a conclusion of no disability cannot be based on Frey's failure to take pain medications. *Id.* Unlike Frey, Sumpter provides no reason why he cannot continue to abate his pain through the use of medi-

cation. Indeed, there is no indication that he experiences any adverse side effects from the medications he relies upon.

Lastly, the record reflects that Sumpter exhibits somatization and avoidant personality features. Record at 430–431. Dr. Liden performed a psychological evaluation of Sumpter which showed an I.Q. of 86 and revealed Sumpter to be socially inhibited and not achievement oriented. *Id.* In spite of these hindrances, a vocational expert testified that 300 or 400 jobs existed in the Montana area which would be suited to Sumpter's personality characteristics by requiring no ongoing dialogue. Record at 91–93. Some of the job possibilities enumerated by the vocational expert include custodial work, small parts bench assembly, watchman checking people in and out, gate keeper, inspection work, packaging machine feeder, and parking attendant in self-service areas, private and public parking lots, and at airport parking facilities. Record at 88–89. Most of these jobs run shifts of 6 to 8 hours according to the vocational expert.

Regarding the hypothetical questions the ALJ posed to the vocational expert, plaintiff relies on *Gamer v. Secretary of Health and Human Services,* 815 F.2d 1275, 1279 (9th Cir.1987) for the argument that hypothetical questions asked of vocational experts must set out *all* of the claimant's impairments. While plaintiff correctly states the *Gamer* requirement of listing all of the claimant's impairments, closer scrutiny of the decision reveals that that requirement is not as all-encompassing as it might appear at first glance. *Gamer* relies upon an earlier Ninth Circuit decision, namely *Gallant v. Heckler,* 753 F.2d 1450, 1456 (9th Cir.1984) for the seemingly all-inclusive requirement. *Gallant* in turn purports to adopt its view directly from the Eighth Circuit's decision in *Baugus v. Secretary of Health and Human Services,* 717 F.2d 443, 447 (8th Cir.1983). Although the main body of the *Baugus* opinion indeed clearly requires the ALJ to set forth all of the claimant's disabilities in a hypothetical question, the presence of the fol-

lowing explanatory footnote suggests a curbing of that requirement:

> We are not suggesting that a hypothetical question must include every physiological impairment suggested by the evidence ... However, hypotheticals must be phrased so that a vocational expert is not required to assume the testimony or record. For purposes of review, the ALJ is required to set forth those physical and mental impairments in the hypothetical *which are accepted as true by the ALJ....*

*Baugus,* 717 F.2d at 447 n. 5 (citation omitted) (emphasis added).

The Tenth Circuit has adopted such a view by citing with approval another Eight Circuit case which relies on *Baugus,* namely *Roberts v. Heckler,* 783 F.2d 110, 112 (8th Cir.1985). *See Brown,* 801 F.2d at 363.

In sum, the meticulous review of the whole record which has been undertaken leaves with the Court a firm impression that ALJ Hiaring's decision is supported by substantial evidence. The problems plaintiff has with his hearing, balance, eyesight (which incidentally was diagnosed as presbyopia, a condition "we all experience in the forties," Record at 236) (statement of Dr. Mitchell), and pain have all been controlled either through corrective devices or medication. Statements made regarding the intensity and persistence of Sumpter's pain are not reasonably consistent with the medical evidence. *See Gatson,* 838 F.2d at 447. Rehabilitation therapy and flexion exercises are entirely under his control. His failure to pursue such remedial measures, together with psychological counseling, cannot translate into an entitlement to disability benefits.

NOW, THEREFORE, IT IS ORDERED that the decision of the Secretary finding plaintiff not disabled and not entitled to either disability insurance benefits or supplemental security income benefits be, and the same is, hereby affirmed.